IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CIVIL ACTION NO. 1:14-CR-0197-SCJ-LTW |
| ISMAIL ALI KHAN and AHMED ALI KHAN, | |
| Defendants. | |

## MAGISTRATE JUDGE'S FINAL REPORT AND  RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This case is presently before the Court on Defendants Ismail Ali Khan and Ahmed Ali Khan's (together "Defendants") Joint Motions to Suppress Evidence.[1]  (See Docs. 111, 127, 128, 130, 132;[2] see also Docs. 164, 204, 171, 215 (post-hearing supporting briefs)).  For the reasons outlined below, this Court **RECOMMENDS** that Defendant's Joint Motions to Suppress Evidence be **DENIED**.  (Docs. 111, 127, 128, 130, 132).[3]

## DEFENDANTS' JOINT MOTIONS TO SUPPRESS STATEMENTS

Defendants argue in their Joint Motions to Suppress Evidence (the "Motion") that

---

[1] Defendant Hardik Kumar Desai joined the Joint Motions to Suppress with regard to any evidence seized from rented storage Units J-11 and J-19, but has since been dismissed from the case pursuant to a plea agreement.  (See Docs. 133, 140, 151, 154).

[2] Defendants Ismail Ali Khan and Ahmed Ali Khan filed separate preliminary and initial motions to suppress, but ultimately consolidated them.

[3] Defendants joint motions for extension of time are **GRANTED**.  (Docs. 170, 203, 211)

evidence seized pursuant to four separate search warrants should be excluded because the attached affidavits lacked probable cause and relied on and were motivated by information obtained through an unlawful search. (Doc. 132). In particular, Defendants argue the three search warrants obtained for three storage units relied improperly upon information obtained during an illegal search of the units, and that another search warrant for an email account lacked probable cause because it stemmed from these other illegal searches. (Id.). After evidentiary hearings were held on the matter, Defendants clarified that they had a expectation of privacy in the three storage units, and that law enforcement's illegal searches of the units – by climbing a ladder to view them from above – improperly motivated the application for the three search warrants related to them; and that the search of the email account was the fruit of those illegal searches. (Docs. 164, 204).

## I.     FACTUAL BACKGROUND

### A.     Agent Shawn Gehan's Investigation of Defendants

The investigation into Defendants activities – along with other individuals named or suspected in this case – was originally handled by Special Agent Shawn Gehan of the United States Food and Drug Administration ("FDA"), who had been a criminal investigator with the FDA since September 2009. (Transcript of March 15, 2016 Evidentiary Hearing ("3/16 Tr."), Doc. 202, p. 88). Agent Gehan began the investigation in September 2011. (Id.). Around that time, the FDA received information about three international packages that had been intercepted at JFK airport that contained what was

purported to be health products or natural male enhancement pills, but were suspected of containing active pharmaceutical ingredients commonly found in Viagra and Cialis, such as Sildenafil, which require prescriptions in the United States.  (Id., pp. 88-90).  One such package was directed to "Stan Khan" at 421 DeKalb Industrial Way, Decatur, Georgia, and another was directed to "IA Khan" at 307 Valleybrook Xing, Decatur, Georgia.  (Gov't Ex. 118).

In December 2011, Agent Gehan determined that the packages were being sent to the Decatur DeKalb Storage and U-Haul facility in Decatur, Georgia.  (3/16 Tr., p. 89).  On December 22, 2011, Agent Gehan visited the storage facility at 421 DeKalb Industrial Way, Decatur, Georgia.  (Id., p. 89).  During his visit, Agent Gehan interviewed the manager of the facility, Chris Cranford.  (Id., p. 91).  After being advised that Agent Gehan was with law enforcement, Mr. Cranford stated that he knew Agent Gehan was there to investigate the Defendants.  (Id., p. 91).  Mr. Cranford showed Agent Gehan the unit used by the Defendants, explained that the space above the unit was open, and offered a ladder to Agent Gehan to look into the unit.  (Id.).  There does not appear to be any testimony about what the terms of Defendants' lease agreement with the facility was or was not, however, evidence was admitted suggesting that Mr. Cranford or others were generally prohibited from viewing storage units in such a manner.  Regardless, Agent Gehan used the proffered ladder to view over the top of a storage unit rented and maintained by the Defendants – the tops only had screens through which the contents could be seen – and took pictures of packages that he could see contained male

enhancement pills.  (Id., pp. 90-93; see also Gov't Exs. 104-06).  Agent Gehan leaned over the side of the unit to take pictures.  (3/16 Tr., p. 114).

Agent Gehan again returned to Decatur DeKalb Storage and U-Haul in January 2012, and spoke again with Mr. Cranford.  (3/16 Tr., pp. 96-99).  At that point, Mr. Cranford explained to Agent Gehan that he (Mr. Cranford) had observed Defendant Ismail Khan throwing wrapping from a pallet of boxes in Defendants' storage unit into the facility's dumpster; Agent Gehan investigated the wrapping and discovered an envelope containing the records of male sexual enhancement products Agent Gehan was previously familiar with.  (Id., pp. 96-99).  Mr. Canford further explained that the contents of the pallet had been returned to the unit.  (Id., p. 100).  Agent Gehan photographed the exterior of the unit, showing that there was significant open space above the wall of the unit and the facility's ceiling, and then used a ladder to view and photograph the contents of the unit rented by Defendants.  (Id., pp. 96-102; see also Gov't Exhibits 110-115).  Agent Gehan did not lean over the wall of the unit to take pictures this time.  (3/16 Tr., p. 114).  Agent Gehan observed that the boxes contained in the storage unit were similar to the boxes intercepted at JKF Airport.  (3/16 Tr., p. 106).  Agent Gehan also conducted surveillance and visited or revisited the Decatur DeKalb Storage and U-Haul business; while there he had multiple conversations about the Defendants' storage units and their activities at the storage facility.  (Gov't Ex. 119).  Agent Gehan left the FDA in September 2012.  (3/16 Tr., pp. 9, 88).

AO 72A
(Rev.8/82)

**B.     Agent Jessica Owen's Continued Investigation**

There was a break in the investigation from approximately May 2012 until the end of October 2012, when Special Agent Jessica Owen of the FDA's Office of Criminal Investigations ("OCI") picked up the investigation shortly after she started with the FDA-OCI.  (3/16 Tr., pp. 9-10, 18).  Agent Owen reviewed Agent Gehan's reports to determine what needed to happen next with the investigation.  (Id., p. 17).  Based upon a review of Agent Gehan's reports,  Agent Owen determined that the investigation began in September 2011, when a package addressed to Decatur, Georgia was intercepted at JFK Airport because it was suspected of containing active pharmaceutical ingredients, despite being labeled health products and all natural.  (Id., pp. 11-14; see also Gov't Ex. 117).  A postal inspector also informed Agent Gehan that the letter carrier for the addressee of the package had stated that the addressee had received numerous large and suspicious packages from overseas. (Gov't Ex. 117).  Additional packages addressed for Decatur and Atlanta and labeled as containing health products, but in fact containing a variety of male enhancement pills, were intercepted at JFK Airport.  (Gov't Ex. 118).  According to Agent Gehan's reports, reviewed by Agent Owen, Mr. Canford at the Decatur DeKalb Store and U-Haul facility reported that Defendants received several suspicious international packages, and that Defendant Ahmed Kahn had given him samples of male enhancement pills.  (Id.).

According to additional reports by Agent Gehan, which Agent Owen reviewed, in January 2012, Mr. Cranford met with Agent Gehan, and gave him a box of male

5

enhancement pills he received from Defendant Ismail Khan, which subsequently tested for active pharmaceutical ingredients. (Gov't Ex. 119). The reports also indicate that later in January, Agent Gehan retrieved from the Decatur DeKalb Storage and U-Haul a list of products apparently received by Defendants that included male enhancement pills. (Id.).

In April 2012, Agent Gehan received another notice from the FDA that another package with an address connected to Defendants had been intercepted. (Gov't Ex. 120). Again, while declared to be a health product, the package contained male enhancement pills. (Id.). In May, Mr. Canford informed Agent Gehan that he had witnessed Defendants packing male enhancement pill boxes into larger boxes. (Id.). Also in May, the postal inspector informed Agent Gehan that more than twenty international packages from Hong Kong were delivered to addresses connected to Defendants; postal employees in Decatur told Agent Gehan that Defendants had picked up several packages from the post office; and Agent Gehan observed ten large parcels waiting for Defendants at the post office, labeled "Beauty Products." (Id.). Agent Gehan observed Defendant Ismail Khan picking up the boxes and witnessed him take them to Decatur Self Storage, a different storage facility from Decatur DeKalb Storage and U-Haul. (Id.).

In October 2012, Agent Owen received confirmation from a postal inspector that Defendants were continuing to receive packages on a daily basis, and confirmed with the managers of the Decatur DeKalb Storage and U-Haul facility and the Decatur Self Storage facility that the Defendants were continuing to use their storage facilities. (3/16

Tr., pp. 17-20).  In November 2012, Agent Owen observed large international packages addressed to Defendants at the Decatur post office.  (Gov't Ex. 122).

Until August 2013, Agent Owen continued to investigate the Defendants' receipt of large packages from China.  (See Gov't Exs. 124-26).  As of July 29, 2013, sample pills obtained during the investigation tested positive for the active pharmaceutical ingredient Sildenafil.  (Gov't Ex. 126).  Before taking maternity leave in August 2013, Agent Owen determined that Defendants were no longer receiving packages at the Decatur post office.  (3/16 Tr., p. 25).  Instead, as Agent Owen later learned, Defendants had been receiving packages from China using a variety of UPS Stores from December 2013 through May 2014.  (Id., pp. 26-26).  After returning from maternity leave and continuing surveillance of Defendants, Agent Owen became suspicious that the investigation had been compromised, and discovered that the Defendants had closed down the storage units where they had been storing the male enhancement products from China.  (Transcript of January 20, 2016 Evidentiary Hearing ("1/16 Tr."), Doc. 183, p. 8; 3/16 Tr., p 26; Gov't Ex. 128).  At this time, Agent Owen intended to apply for a search warrant at the two facilities; however, the Defendants closed their accounts there and stopped using the units.  (Id.).

By January 2014, Agent Owen learned that packages intended for Defendants were being delivered to Extra Space Storage at 5502 Memorial Drive in Stone Mountain, Georgia ("ESS").  (Gov't Ex. 129, p. 2; see also 1/16 Tr., pp. 8-9).  Agent Owen interviewed a mail carrier who delivered packages to the Defendants at the new location,

7

and who showed her a partially torn-open package that contained the same type of sexual enhancement pills that she had been investigating.  (1/16 Tr. pp. 8-9).

By April 2014, Agent Owen felt confident that Defendants were storing various types of male sexual enhancement pills at their ESS storage units.  (1/16 Tr. pp. 11, 60). Agent Owen obtained a subpoena for the records related to storage units at ESS (Gov't Ex. 129, p. 3), and after getting the records related to Units J-11 and J-19, on April 25, 2014, Agent Owen, along with Special Agent Marc Hogan – a criminal investigator with the FDA – went to ESS to meet the manager and conduct surveillance of Units J-11, J-19, and K-160.  (Transcript of April 13, 2015 Evidentiary Hearing ("4/15 Tr."), Doc. 162, pp. 5, 8-9; Gov't Ex. 130, pp. 2-3).  While in the office at ESS, Agents Owen and Hogan noticed on video monitors that one of the vehicles used by the suspects in this case was parked outside Unit J-19.[4]  (4/15 Tr., p. 9).  Agent Hogen went to Unit J-19 posed as maintenance man, along with an employee of the facility, and observed that the door of the unit was open and a car parked outside, and saw approximately 50 large cardboard boxes inside the unit.  (Id.; see also id., p. 17).  Agent Hogan was able to view everything inside the storage unit simply by looking through the open door; of the individual packages observed, Agent Hogan identified boxes with Chinese writing and boxes of a brand called 72HP.  (Id.).  At that time, Agent Hogan knew based upon previous investigations that the product HP72 might contain Sildenafil Nitrate, the active

---

[4] The warehouse portion of the facility included doors large enough for trucks to move in and out.  (4/15 Tr., p. 10).

ingredient in Viagra, which can only be obtained with a prescription.[5] (Id., pp. 7, 17-19). Because of the sexually explicit nature of the packaging and pictures on the other boxes, Agent Hogan also believed them to contain similar male enhancement products that might contain illicit ingredients. (Id., pp. 19-20).

Sometime between April 25 and April 29, 2014, a storage facility employee – likely the manager – suggested to Agent Owen that she use a ladder to look into the units from above to see what was inside them, and offered the use of the ladder contained at the storage facility. (4/15 Tr., pp. 75-76). Again, there was no testimony regarding the terms of the lease agreements for the storage units at ESS, or whether management or others were prohibited from viewing the units. Agent Owen testified that she needed to determine what amount of evidence might be seized pursuant to a search warrant in order to contract in advance with a company to pick up and store the evidence. (1/16 Tr., p. 11). Agent Hogan returned to ESS a few days later on April 29, 2014, and met with employees inside their office; they again suggested the use of the ladder available inside the facility to look inside the units. (4/15 Tr., pp. 20-21). The doors to the units were closed and locked at that time, and the walls of the units were approximately ten feet high; the warehouse ceiling, on the other hand, was approximately thirty feet high, leaving approximately twenty feet of space between the tops of the units and the main

---

[5] Although some of the male enhancement pills to be delivered to Plaintiff's storage units, tested prior to the execution of the search warrant in question, contained active pharmaceutical ingredients Sildenafil or Tadalafil, at least two did not – "72HP" and "Stiff Nights" – which Agent Owen noted in her reports from March and April 2013. (1/16 Tr., p. 50; Gov't Ex. 124).

building ceiling. (Id., pp. 16, 25, 35, 43, 66). The ladder offered to Agent Hogan was approximately ten feet high with a platform on top, and wheels on the base. (Id., p. 22). During that visit, Agent Hogan climbed the ladder to see inside Units J-11, J-19, and K-160, and since the top of the units were only protected by a mesh covering, like chicken wire, his view was unimpeded. (Id., pp. 22-28, 35, 42). For Unit J-19, Agent Hogan placed the ladder in an aisle of the common area of the facility next to the unit; stood on the platform; and took pictures; only for one picture did he lean over the top of the unit. (Id., pp. 23-24, 27, 33; see also Gov't Ex. 2, 4-13). For Unit J-11, Agent Hogan again placed the ladder in an aisle of the common area of the facility next to the unit; stood on the platform; and took pictures; again, for only one picture did he extend the camera over the top of the unit. (4/15 Tr., pp. 35-36, 40; see also Gov't Exs. 14-19). Finally, for Unit K-160, Agent Hogan again positioned the ladder in the common area hallway next to the unit, stood on the platform, and took pictures; in this case, however, he was able to take pictures without leaning over the wall of the unit. (4/15 Tr., pp. 42-47; see also Gov't Exs. 20-26). In each case, Agent Hogan used the camera to take pictures that showed detail about the contents of the units. (4/15 Tr., pp. 29-30).

As noted above, by April 2014, Agent Owen believed that Defendants were storing various types of male sexual enhancement pills at their ESS storage units, including pills containing active pharmaceutical ingredients. Agent Owen testified that by late April, she decided she needed know the quantity stored there for purposes of executing a search warrant. (1/16 Tr. pp. 11, 60). Agent Hogan testified that he had

suspicions about what would be in the units, and he climbed the ladder on April 29, 2014 to "confirm what was inside the storage units."  (Id., p. 69-70).  Agent Hogan later testified that he climbed the ladder to count the boxes within the storage units, in order for Agent Owen to know what size truck to request for the day the search warrants were executed.  (1/16 Tr., p. 11).  Agent Hogan did not testify to the number of boxes he observed, though he did take pictures of the contents.  (4/15 Tr., pp. 24, 50-51; see also Gov't Exs. 4-26).  Agent Owen prepared a report based upon what Agent Hogan observed, including the types of boxes included in the contents, but did not record the number of each in that report, except to note that there were "several large boxes" in each.  (Gov't Ex. 130, p. 4).  Agent Owen testified however, that Agent Hogan helped her count the boxes, and that they used the pictures he took to provide such a count.  (1/16 Tr., pp. 11, 59).  Agent Owen also testified that they produced a rough estimate of the volume of boxes contained in the ESS units.  (Id., pp. 11-12; 4/16 Tr. 6).  Agent Hogan prepared an email with the estimate of the number of boxes, and based upon that estimate, they contacted a supervisor to request that FDA headquarters rent trucks to transport the boxes from the units once they were seized pursuant to search warrants. (3/16 Tr., pp. 7-9; Gov't Exs. 101-03 (emails and request noting approximately 150 small boxes, 50 medium boxes, and 150 large boxes))

Agent Owen drafted search warrant affidavits for the storage units on May 23, 2014, and signed them on May 27, 2014, approximately a month after searching the

11

units.  (4/15 Tr., p. 93; see also Gov't Ex. 130, p. 7).[6]  In her initial draft of the affidavit, Agent Owen did not include facts about what Agent Hogan observed from the ladder on April 29, 2014.  (4/15 Tr., p. 94; 1/16 Tr., p. 12-13).  However, after speaking with Assistant United States Attorney ("AUSA") William McKinnon, Agent Owen included Agent Hogan's observations from his April 29, 2014 visit to the storage facility in the search warrant application.  (4/15 Tr., p. 54; 1/16 Tr. 12-13).

A federal grand jury charged Defendants in a twenty-nine count indictment for allegedly participating in an international smuggling and misbranding conspiracy of male enhancement drugs in violation of 21 U.S.C. §§ 331(a), 333(a)(2), 352(a), 352(c), 352(f); 18 U.S.C. §§ 2, 371, 542, 545, as well as providing false statements to procure naturalization in violation of 18 U.S.C. § 1425(a).  (Doc. 1).  In September and October 2014, the Defendants moved to suppress evidence collected from the ESS units and an email account.  (Docs. 127, 130, 132).  Evidentiary hearings were held on April 13, 2015 and January 4, 2016, the latter of which was continued March 15, 2016.  (Docs. 161, 181, 192; see also Docs. 162, 183, 202).  Defendants submitted a final post-hearing brief on May 11, 2016.  (Doc. 204).  The Government filed a response to Defendants' post-hearing brief on June 15, 2016, (Doc. 209), and Defendants filed their reply on July 8, 2016, (Doc. 215).  Accordingly, this matter is now ripe for a ruling.

---

[6] Agent Gehan had prepared a draft search warrant affidavit in May 2012; however, that affidavit was never submitted for review by any AUSA or formalized for the purposes of a search warrant application.  (4/16 Tr., pp. 35-36, 188-19).

## II.    **JOINT MOTIONS TO SUPPRESS**

Defendants argue in their Motion that evidence seized pursuant to four separate search warrants – for Units J-11, J-19, and K-160, as well as for an email account associated with Defendants – should be excluded because the attached affidavits lacked probable cause and/or relied on information obtained through an unlawful search. (Doc. 132). In particular, Defendants contend that the three search warrants obtained for three storage units relied improperly upon information obtained during Agents Gehan and Hogan's viewing and photographing the storage units from above, and that the other search warrant for an email account, based upon the fruits of these illegal ladder searches, also lacked probable cause. (Id.; see also Docs 164, 204). After the evidentiary hearings were held on the matter, Defendants clarified that they had a expectation of privacy in the three storage units, and that the law enforcement officers illegal search of the units – by climbing a ladder to view them from above – improperly motivated the application for the three search warrants related to them; and that the search of the email account was also the fruit of another law enforcement officer's prior illegal searches. (Id.).

The Government maintains that Defendants had no legitimate expectation of privacy in the storage units, and thus have no standing to challenge the legality of the Agents Gehan and Hogan's ladder searches of them. (Docs. 167, 209). Further, the Government argues that even if the Agents' ladder searches of the units constituted an improper intrusion on the Defendant's privacy rights, there was substantial independent

13

evidence to warrant Agent Owen's decision to pursue the challenged search warrants, and that Agent Owen was not motivated by the ladder searches in applying for the warrants. (Id.). Finally, the Government contends that the good faith exception to the exclusionary rule should apply because Agent Owen acted with the objectively reasonable good-faith belief that the searches were lawful, because she consulted with an AUSA about what to include in the search warrant affidavit, included the ladder observations in the affidavit upon the AUSA's advice, and presented the affidavit to a neutral and detached magistrate judge, who did not question the validity of the ladder searches. (Id.).

## III.   **LEGAL ANALYSIS**

The Fourth Amendment of the Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  As a threshold matter, to challenge a seizure as violating the Fourth Amendment, a defendant must have "standing," that is, a legitimate expectation of privacy in the premises being searched.  See United States v. Gonzalez, 940 F.2d 1413, 1420 n.8 (11th Cir. 1991); see also United States v. Epps, 613 F.3d 1093, 1097 (11th Cir. 2010) ("'[O]nly individuals who have a legitimate expectation of privacy in the area invaded may invoke the protections of the Fourth Amendment.' ") (quoting United States v. Lee, 586 F.3d 859, 864 (11th Cir. 2009)).  As a result, governmental intrusion is barred only in those places where an individual can establish a reasonable expectation of privacy.  See Katz v. United States, 389 U.S. 347, 353 (1967).

14

"Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." Rakas v. Illinois, 439 U.S. 128, 134 (1978) (internal citations omitted). Consequently, a defendant who alleges a Fourth Amendment violation "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88 (1998); United States v. Segura-Baltazar, 448 F.3d 1281, 1286 (11th Cir. 2006). The subjective prong is a factual inquiry, United States v. McKennon, 814 F.2d 1539, 1543 (11th Cir. 1987); see also United States v. Jones, 184 F. App'x. 943, 947 (11th Cir. 2006), and "requires that a person exhibit an actual expectation of privacy," United States v. King, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting Segura-Baltazar, 448 F.3d at 1286). The objective prong is a question of law, McKennon, 814 F.2d at 1543, and "requires that the privacy expectation be one that society is prepared to recognize as reasonable," King, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting Segura-Baltazar, 448 F.3d at 1286). A defendant bears the burden of showing a legitimate expectation of privacy in the area searched. Rakas, 439 U.S. at 130 n. 1; United States v. Brazel, 102 F.3d 1120, 1147-48 (11th Cir. 1997) (when evidence of defendant's tenancy was "uncertain[]," defendant failed to meet his burden of showing expectation of privacy to an apartment); United States v. Bushay, 859 F. Supp. 2d 1335, 1361-63 (N.D. Ga. 2012) (defendant must demonstrate an expectation of privacy by a preponderance of the evidence).

Courts evaluate on a case-by-case basis an individual's standing to challenge an intrusion by government officials into an area over which that person lacked primary

control.  <u>Oliver v. United States</u>, 466 U.S. 170, 191 n.13 (1984).  Lack of ownership in the place searched is not dispositive of whether a defendant has a reasonable expectation of privacy in the place searched.  <u>Chaves</u>, 169 F.3d at 690.  Even if a defendant does not own the property to be searched, he may nonetheless have a reasonable expectation of privacy in that place by virtue of his relationship with that place.  <u>Chaves</u>, 169 F.3d at 690.

Similarly, while "the test of the legitimacy of an expectation of privacy is the same in both the residential and commercial sphere . . . the factors which tend to be of probative value" are not the same,  <u>United States v. Hall</u>, 47 F.3d 1091, 1095 (11th Cir. 1995), and the "expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home." <u>New York v. Burger</u>, 482 U.S. 691, 700 (1987).  Along those lines, it is "[c]ertain[ that] the government's ability to conduct searches of a warehouse is far broader than its ability to search a residence," but the fact that a defendant "has a lesser expectation of privacy in [a] warehouse vis-a-vis a residence, however, does not mean that he has no legitimate expectation of privacy in the warehouse."  <u>Chaves</u>, 169 F.3d at 691; <u>see also</u> <u>United States v. Rodriguez-Alejandro</u>, 664 F.Supp.2d 1320, 1343 (N.D. Ga. 2009) (because of [defendant's] use of residential property as a stash house, there was no reasonable expectation of privacy since the residence "was being used 'primarily for commercial' purposes").

16

Neither party has pointed to, and this Court is unable to find after exhaustive research, controlling precedent regarding an individual's legitimate expectation of privacy in a warehouse storage unit without a roof.[7]  The Government urges that two cases in particular, United States v. Yaya and United States v. Hendrickson, provide sufficiently analogous circumstances to persuade the Court that the Defendants did not have a legitimate expectation of privacy in the storage units, and therefore do not have standing to challenge the searches.  Defendants in response contend that a more recent United States Supreme Court case, Florida v. Jardines, has superceded the rulings in those cases, and instituted more expansive privacy right in circumstances such as those present in this case.

In Hendrickson, the defendant, a previously convicted felon, stored illicit contraband (stolen property, including rifles) in storage unit that the court described as follows:  eight feet by ten feet; having three, nine-foot tall walls of particle board, with a fourth opaque garage door without windows; with a chicken wire ceiling; and having approximately four to six feet of air space between the chicken-wire ceiling and the roof of the warehouse building.  940 F.2d 320, 321 (8th Cir. 1991).  The owner of the unit became suspicious of the defendant's activities, and contacted local law enforcement; the owner also instructed the manager of the warehouse to enter the adjacent unit, cut through its wire ceiling, and observe the contents of the defendant's unit from a ladder;

---

[7] Although there was wiring over the units, for all intents and purposes of the searches in question, the units did not have roofs.

and a list of the contents was then provided to law enforcement. <u>Id.</u>  Those items matched items missing as a result of local burglaries, and law enforcement soon after went to the storage facility, and with the owner's consent, observed the items as well using the ladder in the adjacent unit. <u>Id.</u> at 321-22.  Because the content matched the aforementioned burglaries, as well as others, law enforcement sought and obtained a search warrant for the unit. <u>Id.</u> at 322.  The items recovered, in particular the rifles, formed the basis of the defendant's conviction, and the defendant moved to suppress the evidence recovered from the storage unit. <u>Id.</u>

The Eight Circuit Court of Appeals rejected the defendant's argument that he had legitimate expectation of privacy in the storage unit. <u>Id.</u> at 324.  In particular, the court focused on the objective prong of the analysis, and asked whether society should be "willing to recognize [defendant's] expectation as reasonable," and "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." <u>Id.</u> at 322 (internal citations and quotations omitted).  Analogizing to cases in which illegal drugs grown behind ten foot fences were observed by airplane, the court stated that "[t]he mere fact that the defendant had taken measures to restrict some views of his activities did not preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible.'" <u>Id.</u> (quoting <u>California v. Ciraolo</u>, 476 U.S. 207, 213 (1986)); <u>see also id.</u> at 323 (citing <u>Florida v. Riley</u>, 488 U.S. 445 (1989) (helicopter observations made by police in a helicopter flying at 400 feet were not so rare to make expectation of privacy legitimate).

18

The court drew similarities between the aerial surveillance and the ladder observation, noting that the wire ceiling was the "'functional equivalent of almost no ceiling at all.'" Hendrickson, 940 F.2d at 323 (quoting magistrate judge's report and recommendation). Moreover, the court drew a strong distinction between observations and search conducted in relation to a "defendants's home and curtilage," on the one hand, and "commercial storage units," on the other. Id. Next, the court discussed how the contents "could be viewed from above by the owner or manager of the units and by other persons renting or using the units for any number of reasons," including "curiosity, to determine the source of odors from objects stored in other units, casual observations while stacking . . . objects . . . , repair work . . ., or any other number of situations." Id. at 323-24, 324 n.6 (quoting in part magistrate judge's report and recommendation).[8] Based upon all the reasons above – analogies to aerial surveillance, the commercial nature of the unit, and the many ways in which a person could readily view the contents of the unit – the Eight Circuit held that "the possibilities for observations through the chicken wire ceiling of [the storage] unit are sufficiently routine that the observations made here cannot be said to have infringed upon a legitimate expectation of privacy," especially given that "a person concerned with the privacy of the contents of a unit could cover the items with a blanket or some other opaque covering." Id. at 324.

---

[8] The court did not mention any evidence of actual observations, other than the two discussed by management and law enforcement; its point was that such observations could take place on a routine basis. As discussed above, the subjective expectation is a factual question, while the objective expectation is a legal inquiry.

In Yaya, the defendant again stored illegal contraband (this time property obtained with a stolen credit card) in a rented storage bin at a storage facility. 797 F. Supp. 199, 200 (E.D. N.Y. 1992). A detective traced the defendant, through the stolen credit card information, to a storage facility, where the assistant manager invited the detective to look at the three bins rented by the defendant. Id. "On a stand-alone ladder [the detective] was able to observe the interior of one [of the three] bin[s] [because] the upper portion was covered with wire mesh." Id. Observing items obtained with the stolen credit card, the detective obtained a search warrant based upon his ladder observations. Id. at 200-01. The defendant moved to suppress evidence obtained from the bin on the basis that he had a reasonable expectation of privacy in the bin, and the detective's ladder observation constituted an unlawful search. Id. at 201.

The Yaya court also rejected the defendant's argument that he had a legitimate expectation of privacy in the bin. Id. at 202. In reaching this conclusion, the Court analogized the ladder search to law enforcement viewing illicit conduct from across the street, to surveillance of the interior of a plane from a public air strip, and to aerial surveillance. Id. at 201 (citing United States v. Taborda, 635 F.2d 131 (2d Cir. 1980) (federal agents observed a defendant engaged in a narcotics transaction in the defendant's apartment from an apartment across the street when defendant's curtains were raised); United States v. Bellina, 665 F.2d 1335, 1345 (4th Cir. 1981) (holding that there is no illegal search within the Fourth Amendment where a police officer makes a visual observation of plane from a vantage point he rightfully occupies on a public air

strip); and <u>Riley</u>, 488 U.S. 445 (helicopter observations). Because the mesh top "enabled [the detective], and as a matter of fact any person, to readily observe the interior [of the bin] from a vantage point he had been given free access to by" the storage facility's manager, and because the detective "did not interfere with the defendant's property to secure his observations," the court concluded that there was no infringement of the defendant's legitimate right to privacy.[9] <u>Id.</u> at 201-02.

The Court finds both <u>Hendrickson</u> and <u>Yaya</u> persuasive. In this case, the commercial storage units walls were of similar height; there was no more than mesh wiring covering the tops of the units; the Defendants made no effort to conceal the contents of the units, either by covering the boxes or adding an opaque barrier to the wire ceiling; the managers of the facilities were suspicious that contraband was contained in the units; the managers invited and encouraged Agents Gehan and Hogan to use the facility's ladders, placed in common space (or space not utilized by the Defendants), to observe the contents of the units; and the Agents did not trespass into or otherwise disturb the units themselves or Defendants' property contained in them. Defendants, whose burden it is to demonstrate that they had a legitimate expectation of privacy in the units, have put forth no evidence that any person using the facility – whether owner, manager, employee, or storage user – could not and/or did not make observations of the units in question, or any other unit at the storage facilities. Indeed, that management

---

[9] The <u>Yaya</u> court also noted that the defendant "could have chosen to cover the wire mesh to avoid the observation of its contents by anyone given free access to the bin." <u>Id.</u> at 202, n.4.

chose not to enclose the units, and instead kept a ladder readily available that was just tall enough to view over the sides of the units from the common/public area, and that they both invited the Agents to make such observations, more plausibly suggests that there should not be any legitimate expectation of privacy in the units.

The Court now turns to Defendants' contention that the Supreme Court's decision in Florida v. Jardines rendered Hendrickson and Yaya "obsolete." (Doc. 171, p. 2). Defendants contend that the Jardines decision provided a new framework for analyzing expectations of privacy that focuses "on the motivation of the person conducting the search." (Id.). In that case, a drug dog was used to sniff the front porch of the home in an effort to confirm an anonymous tip that marijuana was being grown inside the home. Jardines, 133 S. Ct. 1409, 1413 (2013). The Court there determined that curtilage – that area immediately surrounding the home, and including the porch – was part of the home itself, and therefore a "constitutionally protected area." Id. at 1413-15. Having reached this determination, the majority analyzed whether there was an "unlicensed physical intrusion" on the property. Id. at 1415. Only because the majority analyzed the matter from the "license to intrude on the property" rubric – asking whether the officers had an "implied license" to enter the home itself with a drug dog – did it find that the officer's purpose in making the search was relevant to the scope of any implicit license; that is, because no one would grant an individual searching for drugs with a drug sniffing dog permission to come onto his porch, there could be no implicit license (whereas many people would grant a person with a dog license to their porch). Id. at 1416-17. Thus, the

majority determined that it "need not decide whether the officers' investigation of [the defendant's] home violated his expectation of privacy" because "they learned what they learned only by physically intruding on the [home]." Id. at 1417

Given the subject matter and framework of the Jardines' majority analysis, there is no reason to think it should upend the law established by Hendrickson and Yaya. First, the subject matter of the search was the defendant's private home residence, and indeed, as the majority made clear, "[w]hen it comes to the Fourth Amendment, the home is first among equals." Id. at 1414.[10]  If the Supreme Court meant to upend decades of legal precedent establishing that residential property was extended greater protections than commercial property, it likely (1) would not have exhorted privacy of the home in its introduction, and (2) would have faced square on the precedent it was overturning. Instead, the Court identified the porch as a constitutionally protected part of the residential property, stated that the decision was an easy one, and held that the officers conducted an unlicensed physical intrusion upon it. Id. at 1414-17.  Moreover, the majority's analytical framework – based upon the porch being part of residential property – completely bypassed (as it made clear) the question of whether the defendant had a legitimate expectation of privacy; and thus, the only reason the officers' motivations were relevant was because of the majority did not use a privacy framework.

---

[10] See also, id. at 1418 (J. Kagan, concurring) ("[T]he home – the most private and inviolate (or so we expect) of all the places and things the Fourth Amendment protects."

The concurrence, joined by three of the five justices in the majority, on the other hand, did analyze the case from the privacy framework. In doing so, it completely ignored the motivations of the officers, and instead simply determined that there was a legitimate right to privacy in a "private home" from the surveillance by the government by the use of a "'device [or in this case, drug-detection dog] that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion.'" Id. at 1419 (J. Kagan, concurring) (quoting Kyllo v. United States, 533 U.S. 27 (2001) (thermal-imaging device to detect heat emanating from a private home)).[11]

This Court is confident that Jardines's majority did not overturn the privacy analyses contained in Hendrickson, Yaya, and elsewhere. Rather, the majority bypassed the privacy analysis altogether as it applied to private homes and those homes' curtilage, and used an alternate analysis applicable in such "easy" situations – analyzing whether there was an implicit license to physically intrude on obviously constitutionally protected property. The concurrence makes clear that the privacy analysis remains alive and robust, and that in circumstances such as the one at hand, it is the defendant's burden to

_____

[11] Defendants' slippery slope argument that law enforcement might now be allowed to view through a skylight a residential home's interior from a plane (see Doc. 171, pp. 3-5) is foreclosed by the concurrences discussion; indeed, such observation would clearly require imaging devices not in use by the general public and would involve observations of areas in a private home not otherwise knowable without physical intrusion.

establish that he had a legitimate (and objective) expectation of privacy in a place, and the accompanying standing to challenge any improper search of that place.[12]

For all the reasons outlined above, then, the Court remains persuaded that the reasoning laid out in the <u>Hendrickson</u> and <u>Yaya</u> opinions applies here.  In this case, Defendants' storage units:

- were commercial units within a larger warehouse facilities owned and operated by other individuals;

- were in the vicinity of other similar units used by other renters, who all had access to the common/public area and who could have, for any number of reasons, looked into Defendants units;

- were only ten feet tall, with no more than mesh wiring covering their tops;

- had many feet of open space above them;

- were located in warehouses in which management kept ladders that could be used to easily see into the units;

- evidenced no attempt by Defendants to conceal their contents, either by directly covering the contents or adding a barrier to the ceiling;

- arose the suspicions of the managers of the facilities; and

---

[12] <u>See also</u>, <u>United States v. Khateeb</u>, No. 8:14-CR-185-T-23MAP, 2015 WL 6438755, at *3 n.10 (M.D. Fla. Oct. 21, 2015) (post-<u>Jardines</u> case noting that although the Government did not raise the issue of standing, the court's view was that neither defendant had a reasonable expectation of privacy in commercial storage units containing smokable synthetic cannabinoid products).

- were subjected to managements' invitation to law enforcement to use the ladders available at the facilities to observe the contents of the units.

Defendants have put forth no evidence of their own that suggests measures were taken to protect the privacy of the units from observation, or even that they themselves felt a subjective expectation of privacy. As a result, considering the circumstances above, they have not met their burden in showing that they had legitimate expectation of privacy or that observations of the units violated any constitutionally protected privacy right. Rakas, 439 U.S. at 130 n. 1; Brazel, 102 F.3d at 1147-48; Hendrickson, 940 F.2d at 324; Yaya, 797 F.Supp. at 202. As a result, the warrants in question were not based on illegal searches, and Defendants motions to suppress the evidence obtained as a result of those warrants should not be excluded.

## CONCLUSION

Based on the foregoing reasons, the Court **RECOMMENDS** that Defendants' Joint Motions to Suppress Evidence be **DENIED**. (Docs. 111, 127, 128, 130, 132, 164). As there are no further motions pending, the undersigned certifies this case ready for trial. The Clerk is directed to terminate the reference to the undersigned.

**SO REPORTED AND RECOMMENDED**, this   19th   day of August, 2016,


/s/LINDA T. WALKER
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

26